# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAYLA KELLEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>FCA US LLC, FIAT CHRYSLER AUTOMOBILES N.V., ROBERT BOSCH GMBH, and ROBERT BOSCH LLC,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Kayla Kelley ("Plaintiff"), by and through her counsel, brings this Class Action Complaint against FCA US LLC, Fiat Chrysler Automobiles N.V., Robert Bosch GMBH, and Robert Bosch LLC (collectively, "Defendants") on behalf of herself and all others similarly situated. Plaintiff alleges, upon personal knowledge as to her own actions and her counsel's investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1.      This case involves so-called environmentally conscious vehicles, engineered to discretely emit pollutants in excess of the applicable limits. Defendants designed, developed, marketed, advertised, distributed, sold, and leased 2014-2016 Dodge Ram 1500 EcoDiesel and 2014-2016 Jeep Grand Cherokee EcoDiesel vehicles that feign compliance with relevant emissions regulations through unlawful use of defeat devices (the "Vehicles"). The defeat devices at issue cause the emissions control systems in the Vehicles to behave differently in emissions-testing conditions than in general driving conditions. As a result, the Vehicles appear emissions compliant during testing, but emit oxides of nitrogen ("NOx") in excess of the applicable standards during general driving conditions. By reducing the effectiveness of the emission control systems, Defendants have sold more than 100,000 non-compliant Vehicles at a premium to well-intentioned consumers seeking greener cars.

2.      As alleged in more detail below, the Vehicles are in violation of the Clean Air Act for the reasons set forth in a notice of violation that the EPA sent to Defendants on or about January 12, 2017.[1]

3.      Defendants worked together to deceive consumers. Robert Bosch GMBH and Robert Bosch LLC (together, "Bosch") collaborated with Fiat Chrysler Automobiles N.V. and FCA US LLC (together, "Fiat Chrysler") to develop the unlawful defeat devices, which were designed and intended to evade United States environmental regulations. In particular, Bosch

---

[1] EPA's January 12, 2017 Notice of Violation ("NOV") to Fiat Chrysler Automobiles, *available at* https://www.epa.gov/sites/production/files/2017-01/documents/fca-caa-nov-2017-01-12.pdf.

manufactured and tested the electronic diesel control ("EDC") central to the defeat device.

4.      FCA, on the other hand, manufactures, designs, markets, sells, and leases the Vehicles—deceptively advertised as "Eco"—concealing the fact that they pollute both in excess of their gasoline-powered counter parts, in excess of the applicable emissions standards, and in excess of what a reasonable consumer would expect from a "clean diesel" vehicle.

5.      Plaintiff brings claims against Defendants individually and on behalf of a class of all other similarly situated purchasers and lessors of the Vehicles in Massachusetts and throughout the United States for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"); (2) Magnuson-Moss Warranty Act (15 U.S.C. § 2301, *et seq.*; (3) breach of express warranty under the common law of each state; (4) breach of contract under the common law of each state; (5) fraudulent concealment under the common law of each state; (6) unjust enrichment under the common law of each state; and (7) violation of the consumer protection laws of each state.

6.      Plaintiff seeks monetary damages, restitution, pollution mitigation, corrective advertising, and injunctive and other equitable relief.  Additionally, Plaintiff and Class Members are entitled to punitive or exemplary damages because Defendants acted deliberately and with malice.

## **PARTIES**

7.      Plaintiff is a resident of Revere, Massachusetts.  On or about April 2016, Plaintiff purchased a 2014 Jeep Grand Cherokee EcoDiesel from Bay State Chrysler Jeep Dodge Ram in Newton, Massachusetts.  Plaintiff is selective in her purchase of vehicles, basing her decisions on environmental impact and fuel economy.

8.      At the time she purchased the 2014 Jeep Grand Cherokee EcoDiesel, Plaintiff traded in her fuel-efficient Kia Optima to, from her perspective, decrease her environmental impact through an eco-branded and diesel-fueled automobile.  Plaintiff researched the 2014 Jeep Grand Cherokee EcoDiesel online prior to her purchase, including the FCA website.  Plaintiff relied on statements regarding clean diesel technology in deciding to purchase the 2014 Jeep

Grand Cherokee EcoDiesel.  Plaintiff took the time to locate a dealership that sold the Vehicles, as not all dealerships offer them.

9.      Defendant FCA US LLC ("FCA") is a Delaware Limited Liability Company, formerly known as Chrysler Group, LLC.  FCA headquarters and principal place of business are located in Auburn Hills, Michigan.  FCA, through its various entities, designs, engineers, manufactures, distributes, and sells vehicles under the brand names Chrysler, Jeep, Dodge, and Ram throughout Massachusetts, the United States, and worldwide.  FCA's Chrysler brand is one of the "Big Three" American automobile brands.  FCA includes major divisions such as Mopar, its automotive parts and accessories division, and SRT, its performance automobile division.

10.     Along with its agents, FCA designed, manufactured, and installed the EcoDiesal engine systems in the Vehicles, in addition to the developing and distributing related promotional materials, advertisements, owners' manuals, and warranty booklets.

11.     Defendant Fiat Chrysler Automobiles N.V. is a Dutch corporation headquartered in London, United Kingdom ("Fiat").  Fiat owns several automotive brands and auto parts manufacturers, and further markets, distributes, warrants, sells, and leases vehicles to franchised dealers.

12.     Fiat wholly owns FCA, and additionally owns Ferrari, Maserati, Alfa Romeo, Fiat Automobiles, Fiat Professional, Lancia, and Abarth.  Fiat and FCA are referred to together herein as "Fiat Chrysler."

13.     Among others, Fiat owns auto parts manufacturer VM Motori.  VM Motori developed and manufactured the EcoDiesel engines contained in the Vehicles.

14.     On January 12, 2017, the United States Environmental Protection Agency ("EPA") issued a Notice of Violation against Fiat and FCA for failing to justify or disclose defeat devices in model year 2014-2016 Dodge Ram 1500 EcoDiesel and 2014-2016 Jeep Grand

Cherokee EcoDiesel vehicles.[2]

15.     Defendant Robert Bosch GmbH is a multinational engineering and electronics company headquartered in Germany.  Robert Bosch GmbH is the parent company of Robert Bosch LLC.

16.     Defendant Robert Bosch LLC is a Delaware limited liability company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan 48331.  Robert Bosch LLC operates as a subsidiary of Robert Bosch GmbH.

17.     The Bosch Group is comprised of Robert Bosch GmbH and its roughly 450 subsidiaries and regional companies in some 60 countries.[3]  As a result, both Bosch GmbH and Bosch LLC operate under the umbrella of the Bosch Group.  The Bosch Group is divided into four business sectors known as Mobility Solutions, Industrial Technology, Consumer Goods, and Energy and Building Technology.

18.     Diesel Systems is a division within the Mobility Solutions Bosch Group business sector.  "The Diesel Systems division at Bosch develops, manufactures and applies diesel systems which contribute towards making vehicles more efficient and more economical."[4]

19.     Knowledgeable individuals at both Bosch GmbH and Robert Bosch LLC are included within Mobility Solutions.  All Bosch employees, whether working in the United States or Germany, hold themselves out as working for Bosch.  Bosch's mission statement, "We are Bosch," unifies all employees and reinforces a singular Bosch identity.

20.     Bosch developed, tested, and manufactured the Electronic Diesel Control Unit 17

---

[2] EPA Notice of Violation to Fiat Chrysler Automobiles N.V. and FCA US LLC (Jan. 12, 2017), *available at* https://www.epa.gov/sites/production/files/2017-01/documents/fca-caa-nov-2017-01-12.pdf.

3 Bosch, Bosch worldwide, Business sectors and divisions,
http://www.bosch.com/en/com/bosch_group/business_sectors_divisions/business_sectors_divisions_2.php (last visited Feb. 21, 2017).

4 Bosch, Bosch worldwide, Diesel Systems,
http://www.bosch.com/en/com/bosch_group/business_sectors_divisions/automotive_technology/diesel_systems/diesel-systems.html (last visited Feb. 21, 2017).

("EDC Unit 17"), the EDC system implemented in the Vehicles. Bosch, in collaboration with Fiat Chrysler programmed the EDC Unit 17 in the Vehicles.

21.    In addition to developing the defeat device, Bosch marketed "clean diesel" in the United States and lobbied U.S. regulators to approve "clean diesel."

## JURISDICTION AND VENUE

22.    This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The aggregated claims of the individual class members exceed $5,000,000, exclusive of interest and costs, and this is a class action in which more than two-thirds of the proposed plaintiff class, on the one hand, and Defendants, on the other, are citizens of different states. Additionally, this Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff's claims arise under the RICO Act, 18 U.S.C. § 1962. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 pursuant to 15 U.S.C. § 2310(d), and has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

23.    This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965(b) and (d). This Court has specific and general personal jurisdiction over Fiat and FCA because Fiat and FCA have minimum contacts with this District, this State, and with the United States. Fiat and FCA conducted business in Massachusetts and otherwise intentionally availed itself of the markets in Massachusetts to render the exercise of jurisdiction by this Court proper. Fiat and FCA marketed, promoted, distributed, and sold the Vehicles in Massachusetts. Moreover, pursuant to the RICO statute, 18 U.S.C. § 1965, personal jurisdiction over one conspirator is sufficient to provide personal jurisdiction over all co-conspirators.

24.    Bosch, like Fiat Chrysler, has minimum contacts with this District, this State, and with the United States. Bosch was essential to the marketing, promoting, distribution, sale, and lease of the Vehicles, as Bosch worked with Fiat Chrysler to design the defeat devices at issue.

25.    Bosch has a strong presence in the United States, and Massachusetts in particular. In 1999, Bosch established its North American Research operation, The Research and

Technology Center North America.  Today, the Research and Technology Center includes offices in Palo Alto, California, Pittsburgh, Pennsylvania, and Cambridge, Massachusetts.[5] Bosch's automotive systems are developed and engineered at technical centers throughout the United States, including Waltham, Massachusetts.[6]  Additionally, Bosch certifies Bosch Service Centers in the state of Massachusetts,[7] and holds information sessions and recruits employees from Massachusetts Institute of Technology.[8]

26.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the alleged claims occurred in this District; Plaintiff purchased the 2014 Jeep Grand Cherokee EcoDiesel in this District, and Fiat Chrysler marketed, promoted, distribute, and sold the Vehicles in this District.

## SUBSTANTIVE ALLEGATIONS

### A.    Diesel Pollution and the EcoDiesel Technology

27.    Although diesel engines have greater fuel efficiency and power than their gasoline-fueled counterparts, these triumphs come at a cost of more harmful emissions.  In fact, diesel engines emit more particulate matter per mile driven than gasoline engines of similar weight.

28.    A mixture of gases and particles, diesel engine exhaust poses a range of health and environmental hazards.  NOx, a byproduct of diesel combustion, includes a variety of nitrogen and oxygen chemical compounds that only form at high temperatures.  NOx reacts with

---

[5] *The Bosch Research and Technology Center North America*, BOSCH, http://www.bosch.us/content/language1/html/rtc.htm (last visited, Feb. 21, 2017).

[6] Bosch in North America, *available at* http://www.bosch.us/content/language1/downloads/BINA07.pdf; *see also* Bosch in the USA, Bosch in Waltham, Bosch, http://www.bosch.us/en/us/our_company_1/locations_1/locations-detail_23617.html (last visited Feb. 21, 2017).

[7] *See, e.g.*, MassDiesel, http://massdiesel.com/ (last visited Feb. 21, 2017).

[8] *See, e.g.*, MIT, Bosch Information Session and Recruiting Event, https://energy.mit.edu/event/bosch-information-session-recruiting-event/ (last visited Feb. 21, 2017).

sunlight in the atmosphere and converts into ozone, an irritant.

29.    According to the EPA, exposure to diesel exhaust can lead to serious health conditions such as asthma and respiratory illness.  Additionally, exposure to diesel exhaust can exacerbate existing heart and lung disease, especially in vulnerable populations such as children and the elderly, and contributes to the production of ground-level ozone, which damages crops and other plant life.

30.    Because of these health and environmental concerns, the EPA began evaluating and regulating gaseous emissions in connection with heavy-duty highway use of diesel engines in the 1970s, along with particle emissions in the 1980s.

31.    In 2012, the World Health Organization's International Agency for Research on Cancer classified diesel exhaust as carcinogenic to humans.

32.    Because of the adverse environmental and health consequences of diesel combustion, and the resultant EPA regulations, automobile manufacturers have sought to improve diesel technology and reduce harmful emissions.

33.    Achieving cleaner diesel is a profitable enterprise, as automobile manufacturers can capitalize on growing consumer preferences for eco-friendly and fuel-efficient cars.

34.    In response to this demand, Defendants developed EcoDiesel.

35.    To comply with applicable EPA regulations, modern turbodiesel engines use ceramic diesel filters to trap particulates before they are emitted as diesel engine exhaust.  A commonly used technology, selective catalytic reduction ("SCR"), is used to reduce NOx emissions by injecting a solution into the exhaust stream.  SCR breaks oxides of nitrogen down into to less toxic substances prior to their emission.  As a result, SCR-equipped vehicles must carry a tank of solution for this purpose.  The injection itself is controlled by the engine control module.

36.    Emissions performance, including the SCR technology, is implemented and managed in the Vehicles through an EDC.

37.    To implement the EcoDiesel engine in the Vehicles, Bosch developed, tested, and

manufactured the EDC Unit 17.

38.     In its February 28, 2006 press release, Bosch introduced the "New Bosch EDC17 engine management system."  It described the EDC17 as the "brain of diesel injection" which "controls every parameter that is important for effective, low-emission combustion."[9]

39.     Bosch reinforced the the EDC17 as unique to the Vehicles, stating its "[e]ffective control of combustion" was a "[c]oncept tailored for all vehicle classes and markets."[10]

40.     Bosch further described the EDC17 in the following manner:

> Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets. In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides. The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary. This improves the precision of the injection throughout the vehicle's entire service life. The system therefore makes an important contribution to observing future exhaust gas emission limits.[11]

41.     In early 2013, Bosch announced that its "clean diesel" technology—the EDC Unit 17—would be featured in the new 2014 Jeep Grand Cherokee 3.0-Liter EcoDiesel.[12]

42.     FCA utilized Bosch's EDC17 technology to create a purportedly eco-friendly diesel vehicle and to tap into the growing market of environmentally-oriented consumers.

43.     To target these consumers, FCA purports to be a steward of the environment, stating, "We are in a race against time. Climate change and the increasing scarcity of traditional sources of energy require new approaches to mobility. Fiat Group is addressing this challenge

---

[9] *The brain of diesel injection: New Bosch EDC17 engine management system*, BOSCH (Feb. 28, 2016), http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.

[10] *Id.*

[11] *Id.*

[12] *Bosch Announces Clean Diesel Technology On 2014 Jeep Grand Cherokee*, PRNEWSWIRE (Jan. 24, 2013), http://www.prnewswire.com/news-releases/bosch-announces-clean-diesel-technology-on-2014-jeep-grand-cherokee-188243051.html.

head-on by ensuring individual freedom of movement with maximum consideration for the environment and local communities."[13]

44.    FCA specifically targets green-minded consumers "who want to drive an efficient, environmentally-friendly truck without sacrificing capability or performance."[14]

**B.    Defendants' False Eco-Friendly and Emissions-Compliant Claims and Marketing**

45.    Defendants falsely and prominently advertised the Vehicles as "clean-diesel technology," "ultra-clean," and generally emissions compliant.

46.    The EcoDiesel logo itself furthers Defendants' environmentally-friendly advertising campaign, branding itself with a leaf and green font:



47.    According to Chrysler Group LLC, now FCA, "Thanks to advanced emissions-control technology, its exhaust is ultra-clean, making this engine available in all 50 states."[15]

48.    FCA summed up the Vehicles as "Good. Clean. Fun," representing "the Bosch emissions control system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx) exit the tailpipe."[16]

49.    The 2015 Jeep Grand Cherokee Brochure pictures the Vehicle driving through a pristine forest, asking "LOVE THE PLANET ALONG WITH GREAT FUEL ECONOMY?

---

[13] Fiat Chrysler's 2014 Sustainability Report at 4, available at http://www.fcanorthamerica.com/company/sustainability/Documents/Fiat%20Chrysler%20Sustainability%20Brochure%202014.pdf.

[14] The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You, Ram Zone (July 16, 2013), https://blog.ramtrucks.com/features/the-2014-ram-1500-with-ecodiesel-engine-available-soon-at-a-dealer-near-you/.

[15] *Chrysler Group LLC, Chrysler Group's 3.0-liter EcoDiesel V-6, 500e Battery-Electric Drive System Among Ward's 10 Best Engines for 2014*, PRNEWSWIRE (Dec. 12, 2013).

[16] Dale Jewett, *EcoDiesel: An Essential Tool for Every Outdoorsman*, FCA NORTH AMERICA (May 22, 2015), https://blog.fcanorthamerica.com/2015/05/22/ecodiesel-an-essential-tool-for-every-outdoorsman/.

THEN THE JEEP BRAND'S DIESEL ENGINE WILL RING TRUE.  IT LETS YOU ADHERE TO YOUR PRINCPLES . . . ."[17]  The 2015 Grand Cherokee is further described as  "[a] marvel of modern engineering . . . the engine delivers quiet, clean diesel technology with low $CO_2$ emissions that exceed requirements in all 50 states."[18]

50.     Defendants marketed EcoDiesel as "Clean Diesel Power"[19]:



51.     FCA claims the Ram 1500 is the "NAFTA market's first and only light-duty pickup powered by clean diesel technology."[20]

---

[17] *2015 Grand Cherokee Brochure*, JEEP, http://www.slideshare.net/seaviewjeep1/2015-jeep-grand-cherokee-brochure (last visited Feb. 13, 2017).

[18] *2015 Grand Cherokee Brochure*, JEEP, http://www.slideshare.net/seaviewjeep1/2015-jeep-grand-cherokee-brochure (last visited Feb. 13, 2017).

[19] Dale Jewett, EcoDiesel: An Essential Tool for Every Outdoorsman, Objects in the Mirror…(blog operated by FCA Digital Media) (May 22, 2015), https://blog.fcanorthamerica.com/2015/05/22/ecodiesel-an-essential-tool-for-every-outdoorsman/.

[20] Chrysler Group's 3.0-liter EcoDiesel V-6, 500e Battery-Electric Drive System Among Ward's 10 Best Engines for 2014, Chrysler Group LLC (FCA) (Dec. 12, 2013), http://www.fcanorthamerica.com/News/ChryslerDocuments/ChryslerGroupLLC_Sustain2013Dec12.pdf.

52.    As below, FCA bolsters its clean-technology claims by stating the Vehicles "leave little trace of being there"[21]:



53.    FCA reinforces its claims of emissions compliance through its inclusion of an Emissions Warranty in the owner's manual of the Vehicles, guaranteeing compliance with applicable emissions regulations.

54.    FCA advertised its Ram 1500 EcoDiesel as belonging in a class of its own, describing it as "[t]he industry's first light-duty diesel engine boasts exceptional torque, reduced $CO_2$ emissions and the best fuel economy of any full-size pickup."[22]

55.    Bosch also touted the 2014 Jeep Grand Cherokee as emissions complaint, stating, "The 2014 Jeep Grand Cherokee features a Bosch emission system compliant with the most stringent emission regulations in the world. From fuel tank to tailpipe, Bosch is pleased to equip this vehicle with top technologies to give consumers a great driving experience requiring fewer stops at the pump."[23]

56.    In addition to touting the Vehicles as emissions compliant, FCA marketed superior fuel economy as compared to the Vehicles' gasoline-fueled counterparts.

---

[21] http://www.jeep.com/en/grand-cherokee/capability/

[22] FCA US LLC, *Ram 1500 EcoDiel in a Class of Its Own*, http://360.fcanorthamerica.com/featured_news/2014-ram-1500-ecodiesel-sets-new-fuel-economy-benchmark/ (last visited Feb. 7, 2017)

[23] *Bosch Announces Clean Diesel Technology On 2014 Jeep Grand Cherokee*, PRNEWSWIRE (Jan. 24, 2013), http://www.prnewswire.com/news-releases/bosch-announces-clean-diesel-technology-on-2014-jeep-grand-cherokee-188243051.html.

57.    For example, FCA features an 3.0L EcoDiesel Savings Calculator[24]:



58.    FCA further advertises the 3.0L EcoDiesel V6 Engine as a "marvel of modern engineering" with "clean-diesel technology" and "low $CO_2$ emissions," capable of up to 730 mile range and up to 30 highway miles per gallon[25]:





3.0L EcoDiesel V6 Engine

Awe-inspiring performance combined with Best-in-Class fuel economy ❹—that's what the 3.0L EcoDiesel V6 engine gives you. A marvel of modern engineering, with a block made of compacted graphite iron and aluminum twin-cam heads, the engine delivers quiet, clean-diesel technology with low $CO_2$ emissions.

---

[25] FCA USA LLC, EcoDiesel Undiscovered, http://www.jeep.com/en/jeep-capabilities/eco-diesel-calculator/#diesel-engine (last visited Feb. 21, 2017).

59.    The EcoDiesel Ram 1500 is marketed to have the best fuel economy of any full-size pickup, in addition to reduced $CO_2$ emissions:



60.    However, Defendants were able to achieve greater fuel efficiency only at the expense of increased, undisclosed, and unlawful emissions.

61.    Should the Vehicles undergo repair to become emissions compliant, engine performance will decrease, changing the fuel economy of the Vehicles, and forcing Class Members to expend additional money on fuel.  These changes to performance, fuel economy, and efficiency will in turn decrease the market value of the Vehicles.

62.    Additionally, Defendants advertised the Vehicles as "reliable" and "long-lasting."[26]  But, insofar as the Vehicles require repair work to achieve emissions compliance, these claims are false and misleading.

**C.    Applicable Environmental Regulations**

63.    The EPA is responsible for ensuring the compliance of vehicles entered into the stream of commerce with emissions regulations.  Under its certification program, the EPA approves vehicles by issuing them certificates of conformity ("COC"), which indicate compliance with the Clean Air Act, 42 USC § 7522 and 40 CFR 86.1843-01.

---

[26] *2017 Ram Trucks*, RAM
https://www.ramtrucks.com/assets/pdf/brochures/2017_Ram_Retail_Brand_Saver.pdf (last visited Feb. 22, 2017).

64.    Pursuant to 40 C.F.R. § 86.1848-10(c)(6), "Vehicles are covered by a certificate of conformity only if they are in all material respects as described in the manufacturer's application for certification . . . ."

65.    To obtain a COC, a light-duty vehicle manufacturer must submit a COC application to the EPA for each test group of vehicles that it intends to enter into commerce within the United States, pursuant to 40 C.F.R. § 86.1843-01.

66.    The COC application must include, *inter alia*, a list of all Auxiliary Emission Control Devices ("AECDs") installed on the vehicles, "a justification for each AECD, the parameters they sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and [a] rationale for why it is not a defeat device."  40 C.F.R. § 86.1844-01(d)(II).

67.    An AECD is defined as "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum.  Or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system" in 40 C.F.R. § 86.1803-01.

68.    Pursuant to 40 CFR 86.1803-01, a defeat device is defined as follows:

"Defeat device means an auxiliary emission control device (AECD) that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless:

(1) Such conditions are substantially included in the Federal emission test procedure;

(2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident; or

(3) The AECD does not go beyond the requirements of engine starting."

**D.    The Volkswagen Defeat Device**

69.    On September 18, 2015, the EPA sent a Notice of Violation of the Clean Air Act

to Volkswagen AG, Audi AG, and Volkswagen Group of America, Inc. (collectively, "Volkswagen") alleging that four-cylinder 2009-2015 Volkswagen and Audi diesel cars sold in the U.S. included software that circumvented EPA emissions standards.  Volkswagen cars equipped with these defeat devices exceeded emissions standards up to 40 times.[27]

70.     Over 11 million Volkswagen cars in Europe and 380,000 Volkswagen cars in the United States were operating in violation of the applicable emissions standards.

71.     Following the Volkswagen scandal, on September 25, 2015, the EPA sent notice to car manufacturers stating that the agency is empowered to conduct vehicle testing for the purposes of investigating potential defeat devices.[28]

72.     According to media reports and Bosch's own public statements, Bosch's EDC Unit 17 was not only used by Fiat, but also by Volkswagen.[29]

73.     Bosch and Volkswagen collaborated in developing and implementing software algorithms which would be incorporated into the EDC17 of numerous 2.0-Liter and 3.0-Liter Volkswagen, Audi, and Porsche vehicles.[30]

---

[27]Statement of Christopher Grundler, Director Office of Transportation and Air Quality Office of Air and Radiation, *available at* https://www.epa.gov/sites/production/files/2015-10/documents/epa-grundler-brooks-testimony-_oct_8_hec_oversight_hearing_-vw.pdf

[28] EPA Conducted Confirmatory Testing, *available at* https://www.epa.gov/sites/production/files/2015-10/documents/cd-mfr-guid-ltr-2015-09-25.pdf

[29] *See, e.g.,* Reuters, *Lawyers Say Bosch Worked 'Hand-in-Glove' with VW in Emissions,* FORTUNE (Aug. 19, 2016), http://fortune.com/2016/08/19/bosch-vw-diesel-emissions-fraud/; Tom Schoenberg & Alan Katz, *U.S. Is Investigating Bosch in Widening VW Diesel-Cheat Scandal*, BLOOMBERG TECHNOLOGY (Sep. 16, 2016), https://www.bloomberg.com/news/articles/2016-09-16/vw-diesel-cheat-probe-widens-as-u-s-said-to-investigate-bosch; Patrick McGee, *Bosch reaches $328m settlement in VW emissions scandal*, FINANCIAL TIMES (Feb. 1, 2017); William Boston, *Lawyers in Volkswagen Case Steer Toward Bosch*, THE WALL STREET JOURNAL (Aug. 18, 2016), https://www.wsj.com/articles/lawyers-in-volkswagen-case-steer-toward-bosch-1471553504 ; Patrick McGee, *Bosch products under scrutiny in VW emissions scandal*, FINANCIAL TIMES (Oct. 4, 2016); Reuters, *VW and Bosch Agree to $1.6 Billion Settlements for Car Owners Over Diesel Scandal*, FORTUNE (Feb. 1, 2017), http://fortune.com/2017/02/01/vw-robert-bosch-diesel-settlement/.

[30] *Id.*

74.    Between 2016 and 2017, Volkswagen and Bosch agreed to settle claims related to Volkswagen defeat devices.[31]

**E.    Defendants' Defeat Device**

75.    On January 12, 2017, the EPA sent a Notice of Violation to Defendants Fiat Chrysler Automobiles N.V. and FCA US LLC in connection with light-duty model year 2014, 2015, and 2016 Jeep Grand Cherokees and Ram 1500 trucks with 3.0-liter diesel engines sold in the United States.[32]

76.    The EPA determined that Defendants Fiat and FCA failed to disclose AECDs in initial motor vehicle applications for COCs in the Vehicles.

77.    As a result of at least right undisclosed AECDs, the EPA determined that the Vehicles do not conform "in all material respects" to the vehicle specifications described in the applications for COCs.

78.    Thus, "FCA violated section 203(a)(I) of the CAA. 42 U.S.C. § 7522(a)(l), for each time it sold, offered for sale, introduced into commerce or delivered for introduction into commerce or imported these vehicles (or caused any of the foregoing acts with respect to these vehicles)."[33]

79.    Because the Vehicles are equipped with up to eight unlawful and undisclosed defeat devices, they conceal the fact they are not emissions compliant.

80.    These devices cause the Vehicles to perform differently during testing for compliance with the EPA emissions standards as opposed to during normal operation and use.

81.    These non-complaint vehicles should not have received COCs and should not have been deemed legal to sell in the United States.

---

[31] *Id.*

[32] The same day, CARB publicly announced that it, too, has issued a Notice of Violation to FCA after detecting the AECDs in Fiat Chrysler's 2014, 2015, and 2016 Jeep Grand Cherokee and Ram 1500 EcoDiesel vehicles.

[33] EPA NOV at 2.

82.    The EPA estimated that, as a result of this failure, the following approximately 103,828 non-compliant vehicles entered the into United States commerce.

83.    Additionally, Germany's Federal Motor Transport Authority (the "KBA") tested, among others, certain Fiat diesel vehicles.  KBA testing indicated that the emissions controls systems certain Fiat diesel models behaved differently after 22 minutes of running—enabling behavior during 20-minute testing conditions that differ from normal driving conditions.[34]

84.    Reuters, citing a German publication, reported that Bosch informed German investigators that Fiat diesel vehicles contain a device that virtually disables exhaust filters.[35] Other media outlets reported that Bosch confirmed that it is cooperating with the KBA.

85.    Fiat, one the other hand, refused to attend a meeting with German Transport Minister Alexander Dobrindt to discuss the defeat devices in question.[36]

86.    Nonetheless, these events reveal that Defendants coordinated and fraudulent conduct enabled the Vehicles to flourish in the United States—a market that had historically held a stigma of diesel vehicles as heavy polluters.

87.    The fraudulent scheme also allowed Defendants to compete with other manufacturers, including Volkswagen, in selling smaller, more eco-friendly and fuel-efficient vehicles.

88.    Defendants succeeded in this scheme through the engine at issue, known as the "EcoDiesel."

89.    The EcoDiesel is a 3.0-liter, six-cylinder turbodiesel that had been under

---

[34] David Tracy, *Here's How Fiat Might also be Cheating on Emissions Tests: Report,* JALOPNIK (Apr. 25, 2016), http://jalopnik.com/heres-how-fiat-might-also-be-cheating-on-emissions-test-1772948181.

[35] *Test of Fiat diesel model shows irregular emissions: Bild am Sonntag*, REUTERS (Apr. 24, 2016), http://www.reuters.com/article/us-fiat-emissions-germany-idUSKCN0XL0MT.

[36] *Fiat backed by Italy in snub of Germany over emissions probe*, AUTOMOTIVE NEWS (May 20, 2016), http://www.autonews.com/article/20160520032214/COPY01/305209962.

development before Fiat acquired VM Motori.[37]

90.    Once Defendants acquired a 50% stake in VM Motori, they integrated the EcoDiesel into Subject Vehicles.

91.    Upon information and belief, the EcoDiesel faced a higher regulatory hurdle in the United States as compared to Europe, as Europe has less stringent standards for emissions of NOx relative to the United States.

92.    To make up for this difference, Defendants implemented the defeat device in the Vehicles to pass regulatory muster in the United States.

93.    Bosch was vital in this scheme.  Bosch's EDC Unit 17 consisted of software programming capable of detecting when the Vehicles were undergoing emissions testing through certain sensor inputs.

94.    Bosch and Fiat Chrysler worked closely to modify the emissions-control software for the specific needs of the Vehicles.  This requires complex, highly proprietary engine management software over which Bosch exerts control.

95.    As one automobile company engineer explained, the software is typically locked to prevent customers, in this case Fiat Chrysler, from making unilateral changes.[38]

96.    According to the anonymous engineer:

> I've had many arguments with Bosch, and they certainly own the dataset software and let their customers tune the curves. Before each dataset is released it goes back to Bosch for its own validation.  Bosch is involved in all the development we ever do. They insist on being present at all our physical tests and they log all their own data, so someone somewhere at Bosch will have known what was going on.  All the software routines have to go through the software verification of Bosch, and they have hundreds of milestones of verification, that's the structure . . . . The car company is never entitled by Bosch to do

---

[37] *An Inside Look at the Ram 1500 3.0L EcoDiesel*, ENGINE LABS (Jan. 11, 2015), http://www.enginelabs.com/engine-tech/an-inside-look-at-the-ram-1500-3-0l-ecodiesel/.

[38] Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, CAR AND DRIVER (Nov. 23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software/

something on their own.[39]

97.     Thus, through the coordinated and fraudulent efforts of Defendants, the Vehicles entered the United States market.

98.     Because the Vehicles are diesel-powered and purport to comply with the relevant emissions standards, they are marketed as eco-friendly and fuel efficient.

99.     But these purported features are only available to consumers at a premium.

100.     Upon information and belief, the EcoDiesel engine is only available on the three most expensive 2014 Grand Cherokee models and adds $4,500 to the overall price tag.[40]  On the 2015 Ram 1500, the EcoDiesel engine adds between $3,120 and $4,960 to the price tag.[41]

101.     But, more than a financial premium is added to the Vehicles, as the EcoDiesel engines featured in the Vehicles come at an additional price: higher and more dangerous emissions.

C.     **Plaintiff's Reliance and Damages**

102.     Plaintiff purchased a 2014 Jeep Grand Cherokee EcoDiesel in Massachusetts over the past four years in reliance on FCA's representations that the Vehicles were "Eco," "clean diesel," and emissions compliant.

103.     Plaintiff was willing to pay for the 2014 Jeep Grand Cherokee EcoDiesel because of the representations that they were "Eco," "clean diesel," and emissions compliant, and would not have purchased the Vehicle, would not have paid as much for the Vehicle, or would have

---

[39] Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, CAR AND DRIVER (Nov. 23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software/

[40] *2014 Jeep Grand Cherokee EcoDiesel® V-6*, CAR AND DRIVER (Feb. 2013), http://www.caranddriver.com/reviews/2014-jeep-grand-cherokee-ecodiesel-v-6-first-drive-review.

[41] *2015 Ram 1500 EcoDiesel® 4x4*, CAR AND DRIVER (Aug. 2015) http://www.caranddriver.com/reviews/2015-ram-1500-4x4-ecodiesel-4x4-test-review (last visited Jan. 14, 2017).

purchased an alternative car in absence of the representations, or with the knowledge that the Vehicles are not compliant with governing emissions regulations, are not "Eco," "clean diesel," or emissions compliant.

104.     Plaintiff paid for "Eco," "clean diesel," and an emissions compliant vehicle, but received a Vehicle that was not in fact "Eco," "clean diesel," or emissions compliant.

105.     The Vehicle that Plaintiff received was worth less than the vehicle for which she paid.  By purchasing a vehicle in reliance on advertising that is false, Plaintiff has suffered injury in fact and lost money as a result of the unfair business practices alleged here.

## CLASS ACTION ALLEGATIONS

106.     Plaintiff seeks relief in her individual capacity and as a representative of all others who are similarly situated.  Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and/or (b)(3), Plaintiff seeks certification of a Nationwide Class, a Multistate Subclass, and a Massachusetts Subclass (collectively, the "Class").

107.     The Nationwide Class is initially defined as follows:

> All persons or entities residing in the United States who purchased or leased the model year 2014–2016 Jeep Grand Cherokee EcoDiesel, or the model year 2014–2016 Dodge Ram EcoDiesel (the "Nationwide Class").

108.     The Multistate Subclass is initially defined as follows:

> All persons or entities who purchased or leased the model year 2014–2016 Jeep Grand Cherokee EcoDiesel, or the model year 2014–2016 Dodge Ram EcoDiesel, and reside in the following: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, and the District of Columbia (the "Multistate Subclass").

109.    The Massachusetts Subclass is initially defined as follows:

> All persons or entities residing in Massachusetts who purchased or
> leased the model year 2014–2016 Jeep Grand Cherokee EcoDiesel,
> or the model year 2014–2016 Dodge Ram EcoDiesel (the
> "Massachusetts Subclass").

110.    Excluded from the Class are Defendants, including any entity in which
Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by
Defendants, as well as the officers, directors, affiliates, legal representatives, predecessors,
successors, and assigns of Defendants.  Also excluded are the judges and Court personnel in this
case and any members of their immediate families, as well as any person who purchased the
Vehicles for the purpose of resale.

111.    Plaintiff reserves the right to amend or modify the Class definitions with greater
specificity or division into subclasses after having had an opportunity to conduct discovery.

112.    <u>Numerosity</u>.  Fed. R. Civ. P. 23(a)(1).  The Class is so numerous that joinder of
all members is unfeasible and not practicable.  While the precise number of Class members has
not been determined at this time, Plaintiff is informed and believes that many thousands of
consumers have purchased the Vehicles.

113.    <u>Commonality</u>.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law
and fact common to the Class, which predominate over any questions affecting only individual
Class members.  These common questions of law and fact include, without limitation:

      a.    Whether Defendants engaged in the conduct alleged herein;

      b.    Whether FCA designed, advertised, marketed, distributed, leased, sold, or
otherwise placed the Vehicles into the stream of commerce in the United States;

      c.    Whether the Vehicles contains a defeat device;

      d.    Whether the emissions control system in the Vehicles does not comply
with EPA requirements;

e.    Whether the EDC in the Vehicles can be made to comply with EPA standards without substantially degrading the performance of the Vehicles;

f.    Whether Defendants knew about the defeat device and, if so, how long Defendants have known;

g.    Whether Defendants' practices were deceptive, unfair, improper and/or misleading;

h.    Whether Defendants' conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

i.    Whether Plaintiff and Class Members overpaid for the Vehicles;

j.    Whether Plaintiff and Class Members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief;

k.    Whether Defendants uniformly conveyed to the class that the Vehicles were "Eco;"

l.    Whether Defendants uniformly conveyed to the class that the Vehicles were "clean diesel;"

m.    Whether Defendants uniformly conveyed to the class that the Vehicles were emissions compliant;

n.    Whether Defendants' claim that the Vehicles are "Eco" is true or false or likely to deceive a reasonable consumer;

o.    Whether Defendants' claim that the Vehicles are "clean diesel" is true or false or likely to deceive a reasonable consumer;

p.    Whether Defendants' claim that the Vehicles are emissions compliant is true or false or likely to deceive a reasonable consumer; and

q.    The nature of the relief, including equitable relief, to which Plaintiff and Class Members are entitled.

114.    Typicality.  Fed. R. Civ. P. 23(a)(3).  Plaintiff's claims are typical of the claims of the Class.  Plaintiff and all Class members were exposed to uniform practices and sustained

24

injury arising out of and caused by Defendants' unlawful conduct.

115.    <u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4).  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff's Counsel are competent and experienced in litigating class actions.

116.    <u>Superiority of Class Action</u>. Fed. R. Civ. P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable.  Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims.  There will be no difficulty in the management of this action as a class action.

117.    <u>Injunctive and Declaratory Relief</u>. Fed. R. Civ. P. 23(b)(2).  Defendants' misrepresentations are uniform as to all members of the Class.  Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

## ANY APPLICABLE STATUTES OF LIMITATIONS ARE TOLLED

118.    Plaintiff and Class Members could not have reasonably discovered, and did not reasonably know, the underlying facts giving rise to the claims alleged herein.

119.    A reasonable and diligent investigation could not have disclosed that Defendants utilized sophisticated technology to deceive the EPA into issuing COCs to otherwise unlawful and non-compliant Vehicles.

120.    Plaintiff and Class Members learned of the existence of Defendants' deception only shortly before filing this action.

121.    Because of the discovery rule, statutes of limitation have been tolled in connection with all claims.

**Tolling Due to Fraudulent Concealment**

122.    All applicable statutes of limitation have been tolled throughout the relevant time period as a result of Defendants' knowing and active fraudulent concealment and denial of the

facts alleged herein.

123.    Upon information and belief, Defendants knew about the existence of the defeat device at issue before this action was filed, but nonetheless continued to distribute, market, sell, and/or lease the Vehicles to Plaintiff and Class Members.  And, despite this knowledge, Defendants concealed and failed to notify Plaintiff and Class Members that the Vehicles had unlawfully entered the steam of commerce and were not in compliance with relevant emissions standards.

**Estoppel**

124.    Defendants have a continuous and on-going duty to disclose to Plaintiff and Class Members whether the Vehicles fail to comply with federal and state laws.

125.    Despite this duty, Defendants failed to comply with applicable emissions standards, and failed to inform Plaintiff and Class Members of their non-compliance during the relevant period.

126.    Defendants actively concealed the true character, quality, performance, and nature of the defeat device in the Vehicles.

127.     Plaintiff and Class Members reasonably relied upon Defendants' knowing and active concealment of these facts.

128.    As a result, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## FIRST CAUSE OF ACTION
### VIOLATION OF 18 U.S.C. § 1962(C)–(D):
### THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
#### (On Behalf of Plaintiff and the Nationwide Class)

129.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

130.    Defendants are all "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

131.    Pursuant to § 1962(c), it is "unlawful for any person employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

132.    Pursuant to § 1962(d), it is further unlawful to for "any person to conspire to violate."

133.    At all times relevant, Defendants have conspired to increase their share in the United States diesel market and increase profits in connection with the Vehicles.  Defendants were able to accomplish this aim only through an unlawful scheme.

134.    This scheme involved conspiring to defraud and defrauding both United States regulators and consumers into believing the Vehicles were "Eco," "clean diesel," and emissions compliant, through feigning compliance with various emissions regulations and falsely and deceptively marketing and advertising the Vehicles ("Fraudulent Enterprise").

135.    At all relevant times, Defendants, including other individuals, entities, and agents both in the United States and abroad, worked together to develop and implement the Fraudulent Enterprise.

136.    At all relevant times, Defendants operated an association-in-fact enterprise, formed for the purpose of fraudulently obtaining COCs for the Vehicles from the EPA, and illegally entering the Vehicles into the stream of commerce.

137.    Fiat and/or FCA intentionally failed to disclose or justify the AECDs for the specific purpose circumventing the emissions-compliance process and obtaining COCs.

138.    These fraudulently-obtained COCs allowed the Vehicles to enter the stream of commerce, albeit unlawfully, through Defendants' pattern of racketeering activity under 18 U.S.C. § 1961(4).

139.    As a direct result of this fraudulent scheme and common course of conduct, Defendants extracted billions of dollars from well-intentioned consumers.

140.    During the relevant period, Fiat Chrysler maintained control over the design, manufacture, and testing of the Vehicles.  In the United States include, Fiat Chrysler

manufactured, distributed, sold, and leased motor vehicles and parts through a network of independent, franchised motor vehicle dealers.  At the same time, Bosch exerted control over access to the proprietary engine control software utilized in the Vehicles.

141.    Defendants and other entities, through the use of separate legal statuses, facilitated and implemented the Fraudulent Enterprise and attempted to obfuscate their coordinated efforts to do so.

142.    VM Motori participated, either directly or indirectly, in the Fraudulent Enterprise by developing, testing, and/or supplying the engines with which the Vehicles were equipped— engines which contained the unlawful defeat devices at issue.

143.    VM Motori began development of the subject engine before Fiat acquired 50% of VM Motori in 2011.  By the time Fiat acquired the remainder of VM Motori in 2013, the Vehicles received COCs and entered the steam of commerce.

144.    VM Motori developed and supplied engines for the Vehicles that contained, were calibrated to, and/or suppressed the existence of a defeat device.

145.    Fiat and/or FCA applied for and obtained COCs for the Vehicles from the EPA.

146.    Bosch furthered the Fraudulent Enterprise, either directly or indirectly, through the vital contribution of developing, supplying, and concealing the defeat devices installed in the Vehicles.

147.    Specifically, Bosch participated in developing and exerted control of the EDC 17 for inclusion in the Vehicles.  Bosch further worked with Fiat Chrysler in developing and implementing the software algorithms essential and unique to the defeat devices at issue. Through these algorithms, Bosch and Fiat Chrysler crafted a software capable of determining testing conditions versus on-road conditions, enabling varied behavior, depending on the conditions.

148.    Bosch exerted control over its proprietary software and prevented automakers

from making unilateral changes.[42]  This level of control renders Bosch a vital participant and co-conspirator in manipulating the EDC 17, and a vital participant co-conspirator in the Fraudulent Enterprise, without whom the scheme could not have been enacted.

149.    Bosch further hosted press events to promote the Vehicles to lawmakers and consumers, and further lobbied legislators and regulators in favor of so-called clean diesel.

150.    In particular, Bosch stated, "Bosch emissions control system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx) exit the tailpipe" and further stated that a Jeep Grand Cherokee or Ram 1500 diesel's engine provides a fuel economy that is "30% better than a comparable gasoline engine."[43]

151.    At all relevant times, the Fraudulent Enterprise constituted a single enterprise or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), associated-in-fact for the common purpose of defrauding U.S. regulators and extracting a profit.

152.    At all relevant times, the Fraudulent Enterprise: (i) existed separately and distinctly from each Defendant; (ii) existed separately and distinctly from the pattern of racketeering in which Defendants engaged; and (iii) was an ongoing organization of legal entities—including Defendants, their subsidiaries, directors, officers, executives, and engineers, VM Motori, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Vehicles through fraudulently-obtained COCs, false and deceptive advertising and marketing, profiting therefrom.

153.    Each member of the Fraudulent Enterprise benefited financially from the actions

---

[42] Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, CAR AND DRIVER

(Nov. 23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software/.

[43] Dale Jewett, *EcoDiesel: An Essential Tool for Every Outdoorsman*, FCA North America (May 22, 2015), https://blog.fcanorthamerica.com/2015/05/22/ecodiesel-an-essential-tool-for-every-outdoorsman/.

and omissions described herein.

154.    The Fraudulent Enterprise engaged in interstate commerce through the development, marketing, promotion, advertisement, sale, and lease of the Vehicles across state lines, and in particular, the unlawful entry of EPA non-complaint the Vehicles into the stream of commerce.

155.    To enact this unlawful purpose, the Fraudulent Enterprise engaged in common communication among co-conspirators.

156.    Each participant and co-conspirator shared in coordinated efforts through financial or contractual relationships to enact the unified fraudulent scheme.

157.    Defendants exerted substantial control over the Fraudulent Enterprise by:

a.    Designing and developing the EDC17 in the Vehicles;

b.    Designing and developing the defeat device in the Vehicles;

c.    Failing to disclose or justify the defeat device to the EPA;

d.    Misrepresenting the Vehicles as "Eco," "clean diesel," and emissions compliant;

e.    Lobbying U.S. regulators for the benefit of the diesel-vehicle market; and

f.    Profiting from the illegal sale of the Vehicles.

158.    The full nature and extent of the Fraudulent Enterprise is not presently known, as this information is in the exclusive control of Defendants.

159.    To implement its Fraudulent Enterprise, Defendants knowingly conducted or participated, directly or indirectly, in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities in violation of 18 U.S.C. § 1341 (concerning mail fraud) and § 1343 (concerning wire fraud).

160.    Defendants' predicate acts of racketeering include mail fraud.  Namely, Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via United States mail or commercial interstate carriers for the purpose of executing the unlawful scheme to develop, manufacture, market, sell, and lease the Vehicles through false and fraudulent actions and omissions.

161.    Defendants' predicate acts of racketeering further include wire fraud.  Namely, Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to develop, manufacture, market, sell, and lease the Vehicles through false and fraudulent actions and omissions.

162.    As a result, Defendants have committed, conspired to commit, and/or aided and abetted in the commission of at least two related predicate acts of racketeering within the past ten years—constituting a "pattern of racketeering activity."

163.    To enact this pattern of racketeering activity, Defendants regularly used facilities, services, distribution channels, and employees of the Fraudulent Enterprise, including transmitting mailings and wires in interstate or foreign commerce.

164.    Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in the facilitation and implementation of their Fraudulent Enterprise uniform action, omissions, and misrepresentation.

165.    Defendants' use of the mails and wires include, among other things, essential elements of the Fraudulent Enterprise, including:

    a.    Software and hardware essential to the Vehicles;

    b.    EDC17;

    c.    The Vehicles;

    d.    Fraudulent COC applications;

    e.    Fraudulently-obtained COCs;

    f.    Documents and communication related to the above;

    g.    Documents and communication related to sales and marketing of the Vehicles;

    h.    Documents and communication related to the sale or lease of the Vehicles to both third-party dealerships and consumers; and

    i.    Documents and communication related to lobbying in support of diesel-fueled vehicles.

166.     As described herein, Defendants engaged in a pattern of related and continuous predicate acts for a period of years with the intention of defrauding United States regulators and consumers.

## SECOND CAUSE OF ACTION

**Breach of Express Warranty Under the Common Laws of Each State**

**(On Behalf of Plaintiff and the Nationwide Class,**

**or Alternatively, the Multistate Subclass or the Massachusetts Subclass)**

167.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

168.     Defendants sold the Vehicles in its regular course of business.

169.     Plaintiff and Class members purchased the Vehicles.

170.     Defendants made a promise and representation to Plaintiffs and Class members that the Vehicles were "Eco," "clean diesel," and generally emissions compliant.  Defendants' promises and representations constituted an express warranty that was provided to all consumers, and that became the basis of the bargain between Plaintiff and Class members on the one hand, and Defendants on the other.  Defendants gave these express warranties to Plaintiff and Class members in written form of marketing and advertising the Vehicles.

171.     Defendants' written affirmations of fact, promises, and/or descriptions as alleged are each a written warranty.

172.     Defendants breached the warranty because the representations that the Vehicles were "Eco," "clean diesel," and generally emissions compliant are false, as the Vehicles did not contain the properties represented by Defendants.

173.     All conditions precedent to seeking liability under this claim for breach of express warranty have been performed by Plaintiff and Class Members who paid for the Vehicles at issue.

174.     Defendants' breaches of warranty have caused Plaintiff and Class members to suffer injuries, paying for falsely and deceptively advertising the Vehicles, and entering into transactions they would not have entered into for the consideration that Plaintiff and Class

Members paid.

175.    As a direct and proximate result of Defendants' breaches of warranty, Plaintiff and Class Members have suffered damages and continue to suffer damages, including economic damages in terms of the difference between the value of the Vehicles as promised and the value of the Vehicles as delivered.

176.    As a result of the breach of these warranties, Plaintiff and Class Members are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and/or other relief as deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

## THIRD CAUSE OF ACTION

### Breach of Implied and Written Warranty Under

### The Magnuson - Moss Warranty Act (15 U.S.C. § 2301, *et seq.*)

### (On Behalf of Plaintiff and the Nationwide Class)

177.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

178.    Vehicles are a "consumer product" as set forth in 15 U.S.C. § 2301(1).

179.    Plaintiff and Class Members are "consumers" as set forth in in 15 U.S.C. § 2301(3).

180.    Defendants are each a "warrantor" and "supplier" as set forth in 15 U.S.C. § 2301(4)-(5).

181.    Pursuant to 15 U.S.C. § 2310(d)(1), a consumer who is damaged by the failure of a warrantor to comply with an implied or written warranty has a cause of action against that warrantor.

182.    As described herein, Defendants provided Plaintiff and Class Members with "implied warranties" and "written warranties" as set forth in 15 U.S.C. § 2301.

183.    As described herein, Defendants have breached those warranties in, including but not limited to, selling and/or leasing to Plaintiff and Class Members Vehicles which are not emissions compliant.

33

184.    Defendants have failed to comply with their obligations under their written and implied promises, warranties, and representations, as set forth herein, despite their knowledge that Vehicles contain defeat devices rendering them non-complaint with applicable emissions standards.

185.    Any purported exclusion of software effectuating or enabling a defeat device from warranty coverage is unconscionable.

186.    All jurisdictional prerequisites have been satisfied.

187.    Pursuant to 15 U.S.C. § 2310, due to Defendants' breach of warranties, Plaintiff and Class Members are entitled to revoke their acceptance of the vehicles, obtain damages and equitable relief, and obtain costs pursuant to 15 U.S.C. § 2310.

## FOURTH CAUSE OF ACTION

### Breach of Contract

### (On Behalf of Plaintiff and the Nationwide Class,

### or Alternatively, the Multistate Subclass or the Massachusetts Subclass)

188.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

189.    The purchase or lease of the Vehicles between Class Members and Defendants constituted a contract between the parties.

190.    Defendants materially breached these contracts by selling or leasing the Vehicles not legally in the stream of commerce because the Vehicles contained defeat devices, the Vehicles are not compliant with governing state and federal emissions laws and regulations, and the Vehicles are of a quality different than advertised and promised.

191.    Defendants' actions and omissions, including material misrepresentations, caused Plaintiff and Class Members to enter into contracts for the purchase or lease of the Vehicles.

192.    Absent these actions and omissions, Plaintiff and Class Members would not have entered into contracts for the purchase of lease of the Vehicles, or would have paid less money in connection with the purchase or lease of the Vehicles.  As a result, Plaintiff and Class Members

did not receive the benefit of their bargains.

193.    Defendants likewise breached the implied covenant of good faith and fair dealing by entering the Vehicles into the stream of commerce when Defendants knew the Vehicles to be non-compliant with governing rules and regulations concerning emissions, knew the Vehicles to contain defeat devices, and knew the Vehicles to pollute in excess of a reasonable consumers' expectation of "Eco," "clean diesel," and emissions compliant.

194.    As a direct and proximate result of Defendants' breach, Plaintiff and the other Class Members have been damaged in an amount to be proven at trial, including but not limited to, all compensatory damages, incidental, and consequential damages.

## FIFTH CAUSE OF ACTION

### Fraudulent Concealment

### (On Behalf of Plaintiff and the Nationwide Class,

### or Alternatively, the Multistate Subclass or the Massachusetts Subclass)

195.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

196.    Defendants intentionally concealed the fact that the Vehicles contained defeat devices that gave the appearance of complying with applicable emissions requirements during testing conditions—but not during normal driving conditions.

197.    Defendants knew that, under normal driving conditions, the Vehicles would pollute at levels higher than gasoline-powered counterparts, pollute at levels higher than a reasonable consumer would expect of a "Eco," "clean diesel," and emissions compliant vehicle, and would not comply with governing emissions standards and regulations.

198.    Defendants acted with reckless disregard for the truth, and intentionally withheld information germane to the purchasing decisions of Plaintiff and Class Members.

199.    Defendants affirmatively represented that the Vehicles were "Eco," "clean diesel," and emissions compliant.

200.    Defendants knew these misrepresentations were false when made.

201.    The Vehicles purchased or leased by Plaintiff and Class Members were in fact

defective and, as a result, polluted at a rate higher than gasoline-powered counterparts and at rate higher than a reasonable person would expect of a vehicle advertised as "Eco," "clean diesel," and emissions compliant.

202.    Defendants had a duty to disclose that the Vehicles were not issued valid COCs, were not lawfully in the stream of commerce, employed defeat devices, and polluted at rates in excess of gasoline-powered counterparts and in excess of what a reasonable consumer would expect.

203.    Plaintiff and Class Members reasonably relied on Defendants' material representations that the Vehicles were "Eco," "clean diesel," and emissions compliant.

204.    The truth about the defeat devices and the non-compliance of the Vehicles with applicable emissions standards and regulations was known only to Defendants.  Defendants actively concealed these facts, and Plaintiff and Class Members did not know these facts at the time they elected to purchase or lease the Vehicles.

205.    Plaintiff and Class Members had no way of knowing that the Vehicles were not compliant with applicable emissions standards, were not "Eco," "clean diesel," and emissions compliant.  Defendants had exclusive knowledge as to these facts, and Defendants knew these facts were not known to or reasonably discoverable by Plaintiff and Class Members.

206.    Defendants also had a duty to disclose the existence of the defeat devices because they made affirmative representations about the qualities of the Vehicles with respect to emissions.

207.    These omitted and concealed facts were material because they directly impact the value of the Vehicles.

208.    Whether an automobile complies with federal and state emissions regulations, whether the auto manufacturer tells the truth with respect to such compliance, and whether the automobile has lawfully entered the stream of commerce are material concerns to a consumer.

209.    Defendants actively concealed and/or suppressed these material facts in order to extract a premium from consumers seeking environmentally-friendly vehicles.

210.    As a result of this concealment and suppression of facts, Plaintiff and Class Members have sustained damage in the form of paying a premium for vehicles of diminished value.  Had Plaintiff and Class Members known the Vehicles contain defeat devices, they would not purchased or leased the Vehicles at all, or they would have paid less for the Vehicles.

211.    Defendants' actions and omissions were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights—warranting punitive damages in an amount sufficient to deter such conduct in the future, to be determined according to proof.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment

### (On Behalf of Plaintiff and the Nationwide Class,
### or Alternatively, the Multistate Subclass or the Massachusetts Subclass)

212.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

213.    Plaintiff and the Class have conferred substantial benefits on Defendants by purchasing the Vehicles, and Defendants have knowingly and willingly accepted and enjoyed these benefits.

214.    Defendants either knew or should have known that the payments rendered by Plaintiffs and the Class were given and received with the expectation that the Vehicles would be as represented and warranted.  For Defendants to retain the benefit of the payments under these circumstances is inequitable.

215.    Defendants, through deliberate misrepresentations or omissions in connection with the advertising, marketing, promotion, and sale of the Vehicles, reaped benefits, which resulted in Defendants' wrongful receipt of profits.

216.    Equity demands disgorgement of Defendants' ill-gotten gains.  Defendants will be unjustly enriched unless Defendants are ordered to disgorge those profits for the benefit of Plaintiffs and the Class.

217.    As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, Plaintiffs and other Class Members are entitled to restitution from, and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by, Defendants.

## SEVENTH CAUSE OF ACTION

### Violation of State Consumer Protection Acts

### (On Behalf of the Multistate Subclass)

218.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

219.    The Consumer Protection Acts of the States in the Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

220.    Defendants intended that Plaintiff and Class Members would rely upon their deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

221.    As a result of the Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiffs and Class Members have sustained damages in an amount to be proven at trial.

222.    In addition, Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## EIGHTH CAUSE OF ACTION

### Violations of Massachusetts General Law ch. 266, § 91

### (On Behalf of Plaintiff and the Massachusetts Subclass)

223.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

224.    Defendants' labeling, advertising, marketing, and promotion of the Vehicles is untrue, deceptive and misleading, in violation of Mass. G.L. ch. 266, Section 91.

225.    At all times relevant, Defendants knew or, upon reasonable investigation, could have ascertained that its labeling, advertising, marketing, and promotion of the Vehicles was untrue, deceptive, and misleading.

226.    Defendants' untrue, deceptive, and misleading labeling, advertising, marketing,

and promotion of the Vehicles have continued throughout the Class Period, and is continuing as of the present date.

227.     As purchasers of the Vehicles who were injured by Defendants' false and misleading advertising (in that Plaintiff and Class Members purchased Vehicles that did not conform to the representations made about them by Defendant as set forth above), Plaintiff is entitled to and does bring this class action to seek all available remedies under Mass. G.L. ch. 266, Section 91, including injunctive relief.  The injunctive relief would include an Order directing Defendants to cease its false and misleading advertising and retrieve existing false and misleading advertising.

228.     Plaintiff has lost money and suffered injury in fact as a result of Defendants' conduct because she purchased a "Eco," "clean diesel," and emissions compliant vehicle but did not receive an "Eco," "clean diesel," and emissions compliant vehicle.

## NINTH CAUSE OF ACTION

### Violations of Massachusetts General Law ch. 93A

### (On Behalf of Plaintiff and the Massachusetts Subclass)

229.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

230.     At all times relevant, Defendants knew or, upon reasonable investigation, could have ascertained that its labeling, advertising, marketing, and promotion of the Vehicles was untrue, deceptive, and misleading.

231.     Plaintiff intends to assert a claim under the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A (the "MCPA").  MCPA § 2(1), proscribes "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce."

232.     MCPA § 9 permits any consumer injured by a violation of the MCPA to bring a civil action, including a class action, for damages and injunctive relief.

233.     As alleged more fully herein, Defendants violated MCPA § 2 by falsely advertising and marketing the Vehicles as "Eco," "clean diesel," and emissions compliant that are not "Eco," "clean diesel," and emissions compliant because they pollute in excess of the

applicable emissions standards.

234.    Pursuant to MCPA § 9, Plaintiff, on behalf of herself and the Class, seeks an order:

        a.    enjoining Defendants from continuing to engage in, use, or employ any of the unfair and/or deceptive business acts or practices set forth in detail above; and

        b.    disgorging and restoring all monies that may have been acquired by Defendants as a result of such unfair and/or deceptive acts or practices.

235.    Plaintiff and Class Members will be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

236.    The unfair and deceptive acts and practices of Defendants, as described above, present a serious threat to Plaintiff and Class Members.

237.    Based on the foregoing, Plaintiff and the other Class Members are entitled to all remedies available pursuant to the MCPA, including, but not limited to, refunds, actual damages, or statutory damages in the amount of twenty-five dollars per violation, whichever is greater, double or treble damages, attorneys' fees, and other reasonable costs.

238.    Pursuant to MCPA § 6B, Plaintiff and Class Members are further entitled to pre-judgment interest as a direct and proximate result of Defendants' wrongful conduct.  The amount of damages suffered is a sum certain and capable of calculation and Plaintiff and Class Members are entitled to interest in an amount according to proof.

239.    Massachusetts has a strong interest in applying MCPA to the conduct at issue here.  Plaintiffs is located in Massachusetts, and Defendants advertised, marketed, and sold products in Massachusetts.

240.    Plaintiff sent a letter and made a demand in satisfaction of MCPA § 9(3) on February 28, 2017, and may amend this Complaint to assert claims under the MCPA once the required 30 days have elapsed.

241.    This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the MCPA.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in her favor and against Defendants, as follows:

A.      Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing the undersigned counsel as Class Counsel;

B.      Awarding injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, requiring Defendants to repair, recall, and/or replace the Vehicles, requiring Defendants to extend applicable warranties to a reasonable period of time, and ordering Defendants to engage in a corrective advertising campaign;

C.      For an accounting by Defendants for any and all profits derived from the herein-alleged unlawful, unfair, and/or fraudulent conduct, and/or business practices;

D.      Ordering Defendants to pay actual damages, restitution, and disgorgement of all money or property wrongfully obtained by Defendant by means of their herein-alleged unlawful, unfair, and fraudulent business practices, and equitable monetary relief to Plaintiff and the other members of the Class;

E.      Recovery of the amounts by which Defendants have been unjustly enriched;

F.      Ordering Defendants to pay punitive damages, as allowable by law, to Plaintiff and Class Members;

G.      Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiff and the Class;

H.      Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

I.      Ordering such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.


DATED:  March 1, 2017                Respectfully submitted,


                                By: /s/ Erica C. Mirabella
                                Erica C. Mirabella (MA Bar No. 676750)
                                MIRABELLA LAW
                                132 Boylston Street, 5th Floor
                                Boston, MA 02116
                                Tel: (617) 580-8270; Fax: (617) 583-1905
                                E-mail: erica@mirabellaLLC.com

                                Tina Wolfson (*pro hac vice* application
                                forthcoming)
                                AHDOOT & WOLFSON, PC
                                1016 Palm Avenue
                                West Hollywood, California 90069
                                Tel: 310-474-9111; Fax: 310-474-8585
                                E-mail: twolfson@ahdootwolfson.com

                                *Attorneys for Plaintiff and the Proposed Classes*